[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The instant case involves a contested hearing in damages where the defendants in default did not give notice of an intention to contradict any of the allegations in the complaint. Consequently, the matter in dispute concerns the amount of damages that the plaintiff is entitled to receive. Gen. Stat. 52-221; Practice Book 367.
The complaint contains three counts. In the first count, the plaintiff claims that a five year lease commencing January 1, 1989 was breached when the defendants vacated the premises and refused to pay the monthly rent after May of 1992. On the first count, the plaintiff seeks damages plus reasonable attorney's fees and costs of collection. The second count alleges the wrongful termination of an employment agreement that the plaintiff had with the defendants. The third count is related to the second count and alleges that the defendants failed to provide the plaintiff with the vacation pay to which she was entitled. No specific dollar amounts are alleged in the second and third counts. The complaint states, however, that these counts are a violation of Gen. Stat. 31-72, which allows double damages, costs and an CT Page 4062 attorney's fee in a civil action to recover wages.
 I.
From the evidence produced at the hearing, the court finds that the facts set forth below were established.
 A.
On January 1, 1989, the plaintiff entered into a five year written lease of her property located at 18 Old Route 7 in Brookfield. The tenant named in the body of the lease is Colonial Hair Stylists, Inc. In the space reserved for the tenant's signature, however, the name of Colonial Hair Stylist, Inc. does not appear. Instead both defendants signed their names apparently in their individual capacities. Moreover, not having given notice of an intention to claim otherwise, the defendants could not validly do so at the hearing in damages.
The rent reserved in the lease was $1,600 per month "with automatic yearly increases based on cost of living for year as published by the U.S. Government in November of any year during the term of the lease and become effective as of the 1st day of January of the new year." The monthly rent had been increased twice pursuant to the cost of living adjustments. In the second year of the lease, the increase was $179.00 per month and in the third year, the increase was $192.00 per month. The increases were calculated by Richard Mark, the husband of the defendant, Doris Mark. At one time, he had been the plaintiff's accountant.
The leased premises were used as a hairdressing salon. The plaintiff and both defendants are hairstylists. The building also contains two rent-paying apartments. The plaintiff's monthly mortgage payment is $1,600.00.
On May 31, 1992, the defendants, after giving ten days notice to the plaintiff, moved from her building to a shopping center one mile away where they set up a new salon under the name of Mark Williams Studio. When they moved, the defendants divided the equipment of the business into two portions of two-thirds and one-third. The one-third portion was left for the plaintiff. Before May 18, 1992, however, the plaintiff had heard of the impending move from several sources. On May 18, 1992, her attorneys wrote to the defendant's lawyer concerning the contemplated move and the defendants' obligations. CT Page 4063
The defendants opened their new salon, Mark Williams Studio, in June 1992. In the same month, the plaintiff listed the vacated premises with a realtor for sale or for lease at $1,500.00 per month. There were no serious inquiries from prospective purchasers or tenants. The plaintiff, who was working for the nearby Nu-Way Beauty Salon, decided to reopen a hairstyling shop in the vacant premises. By August 1, 1992, she was back in business as Geri's Hairport.
Although the plaintiff reopened the premises on August 3, 1992, she, as tenant, did not pay any rent to herself, as landlord, until October 1992. In October, 1992, and for all succeeding months, the plaintiff, as landlord, has been receiving rent in the amount of $1,500.00. The plaintiff also incurred expenses in starting her new business.
On the first count of the complaint, the plaintiff has computed her damages as follows: Four months rent at $1,848.00 per month, as determined from the last cost of living increase, totaling $7,392.00; twenty-six months rent at $348.00 per month, representing the difference between $1,848.00 and the $1,500.00 that the plaintiff is receiving per month from Geri's Hairport, totaling $9,048.00, advertising expenses of $2,909.43 incurred because the defendants were using the telephone number originally assigned to Colonial Hair Stylists, Inc., the new telephone directory had already been printed and it was important to the plaintiff that her clients should know where she was located; expenses of $4,397.81 to renovate and repair the premises including $2,185.00 for the installation of a handicap ramp, $1,067.00 for a new carpet and other amounts for plumbing, the installation of two new sinks, new lighting and the painting of the premises; expenses of $9,283.19 that the plaintiff described as "startup" costs for equipment and supplies. The grand total of these amounts is $33,030.43. Not included in the plaintiff's computations is the value of the one-third portion of equipment that the defendants left when they moved out. The defendants valued the items left at $17,584.00.
 B.
On September 17, 1990, an employment agreement was entered into by William Possidento and Doris Mark, the defendants herein, and Lee Allman doing business as Colonial Hair Stylists, Inc., collectively referred to as the employer and Geraldine O. CT Page 4064 Anderson, the plaintiff, referred to as the employee. Pursuant to this agreement, the plaintiff was guaranteed employment as a haircutter, hairdresser and hairstylist at the employer's place of business for a term of five years starting on September 17, 1990. The agreement provided that the plaintiff's base pay was to be 50% of the gross receipts received by the employer for services to clients that were performed by the plaintiff. In addition, the plaintiff was, pursuant to the agreement, entitled to keep all tips given for her services, whether paid to her directly or whether received by the employer.
The plaintiff's brief states that she is not claiming "lost wages" because she was able to mitigate potential damages in that she was employed by another shop, presumably Nu-Way Beauty Salon for two months and thereafter, she was self-employed at Geri's Hairport. She does, however, claim vacation pay under 3(d) of the employment agreement. The language of 3(d) is that
 [d]uring the continuation of the Employee's employment hereunder, the Employee shall be entitled to reasonable paid vacation of not less than fifteen (15) business days during the term of the agreement at a weekly rate equal to the net base pay compensation received by the Employee for the week immediately preceding any vacation period, payable in advance of any vacation period and in addition to any other compensation due hereunder.
The plaintiff has interpreted 3(d) as entitling her to three weeks of vacation in each year of her employment. Apparently, the defendants agree. Doris Mark testified that she told the plaintiff we would pay her when we could afford it. Left for the court to decide is the computation of the vacation pay and to determine whether the double damage and the attorney's fee provisions of Gen. Stat. 31-72 should be applied. The plaintiff claims one week is owed for the first year of employment (September 17, 1990 to September 16, 1991) and three weeks are owed for the second year (September 17, 1991 — October 16, 1992).
 C.
If the posture of this case were not a hearing in damages and if the defendants did not admit that they personally owed some money to the plaintiff on the lease and for vacation pay, the CT Page 4065 specter of Colonial Hair Stylists, Inc. could have complicated matters. In 1980, Colonial Hair Stylists, Inc. was incorporated by the defendant, William Possidento, the plaintiff and the plaintiff's husband. The plaintiff was appointed statutory agent for service. In 1985, Colonial Hair Stylists, Inc. was dissolved by forfeiture for its failure to file reports with the Secretary of the State.
After dissolution, however, Colonial Hair Stylists, Inc. maintained a defacto existence. As an officer of the defacto corporation, Doris Mark signed tax returns for 1989, 1990 and 1991. In 1990, the plaintiff sold her "shares" to Lee Allman who rents a room in her house and who was one of the signatories to the employment agreement. Thereafter, the plaintiff appeared as Lee Allman's proxy at all "corporate meetings." The defacto corporation was dissolved at a vote of its members on May 31, 1991. William Possidento and Doris Mark voted for dissolution. The plaintiff, as proxy for Lee Allman, voted against.
 D.
In addition to the foregoing facts, the court has made other findings that appear in subsequent sections of this memorandum.
 II.
A lease is a contract and should be interpreted as such. Solomon v. Hall-Brooke Foundation, Inc., 30 Conn. App. 136, 145
(1993). The lease between the plaintiff and the defendants consists of a printed form with handwritten additions and deletions made by drawing lines through words, phrases or sentences. In the construction of any lease, three principles should be kept in mind: "(1) the intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given to ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such manner as to give effect to every provision if reasonably possible." Hatcho Corporation v. Della Pietra, 195 Conn. 18, 20 (1985).
To support her claims for damages in the first count, the plaintiff relies upon Sagamore Corporation v. Willcutt, 120 Conn. 315
(1935). And she as well as the defendants are in seeming agreement that Danpar Associates v. Somersville Mills Sales Room, CT Page 4066 Inc., 182 Conn. 444, 446 (1980) requires a landlord to make reasonable efforts to minimize the damages caused by the defaulting tenant's breach of the lease.
Sagamore Corporation v. Willcutt, supra involved a situation where a tenant, who had a lease for one year, vacated the premises and thereafter notified the landlord that he would no longer comply with the terms of the lease and would not pay any further rent. The Supreme Court said that since a lease is either a unilateral contract or a bilateral one in which the landlord has wholly performed by the act of leasing, the failure of the tenant to pay an installment of rent as it came due would only amount to a partial breach of the tenant's contract. 120 Conn. at 319-20. But, as the court advised, if the partial breach were accompanied or succeeded by a total repudiation of the tenant's rental obligation, the landlord would be justified in treating the tenant's default as an anticipatory breach of the entire contract. Id. at 318. If an anticipatory breach has occurred, as by the tenant's abandonment of the leased premises and refused to pay further rent, the landlord has two options. "He may accept the surrender of the premises, thereby terminating the lease and effecting a rescission of the contract or he may refuse to accept the surrender." If the landlord refuses to accept the surrender, "he may let the property lie idle and collect the balance of the rent due under the lease, or he may take possession of the property and lease it to others; in which case he may recover from the original lessee the balance of the rent due under his lease less the rent received from the new lessee. Whether the taking of possession of the premises constitutes a rescission of the contract depends upon [the landlord's] intent." Id. at 317-18.
Sagamore Corporation v. Willcutt is undoubtedly good law today. It was the authority for the Appellate Court's decision in Rokalor Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384
(1989) where the Appellate Court repeated what was said in Sagamore and in Danpar Associates v. Somersville Mills Sales Room, Inc., supra, as well as its own case of Dewart Building Partnership v. Union Trust Co., 4 Conn. App. 683, 685 (1985). When the tenant breaches a lease for commercial property, the landlord has two options: (1) to terminate the tenancy or (2) to refuse to accept the surrender. Where the landlord elects not to terminate, he may sue to recover the rent due under the terms of the lease. This course of action does not impose a duty on the landlord to mitigate damages. When the landlord elects to terminate the tenancy, however, the action is for breach of contract CT Page 4067 and the landlord is obliged to mitigate his damages.18 Conn. App. at 388. (internal citations omitted.)
In line with the above, Rokalor, Inc. v. Connecticut Eating Enterprises, supra at 389, interpreted Feneck v. Nowakowski,146 Conn. 434, 439 (1958) (eviction releases tenant from obligation to pay rent under the lease after his ouster) to apply to situations where rent rather than damages was being claimed. Not that rent and damages are truly exclusive concepts. Where the landlord terminates the tenancy upon the tenant's default, rent qua rent may not be recoverable but the amount of rent that the tenant agreed to pay can be used in determining what damages the landlord has sustained. Rokalor, Inc., supra at 389-90.
There appears to be no disagreement with the plaintiff's contention that she accepted the defendant's surrender of the premises and because of it terminated the lease. In the lease document paragraph 17.d purports to cover such a contingency. The provisions of 17.d are set forth below. For the sake of clarity, the deleted language is placed in parentheses instead of being lined out as in the original.
 If the lease is ended or Landlord takes back the Premises, Landlord may re-rent the Premises and anything in it for any Term. (Landlord may re-rent for a lower rent and give allowances to the new tenant.) Tenant shall be responsible for Landlord's cost of re-renting. Landlord's cost shall include the cost of repairs, decorations, broker's fees, attorney's fees, advertising and preparation for renting. Tenant shall continue to be responsible for rent, expenses, damages and losses. Any rent received from the re-renting shall be applied to the reduction of money Tenant owes. Tenant waives all rights to return to the Premises after possession is given to the Landlord by a Court.
The general rule of damages in a breach of contract is that the injured party, as for as can be done by money, is to be placed in the same position as he would have been in if the contract had been performed. Beckman v. Jalich Homes, Inc., 190 Conn. 299, 309
(1983); Jacobs v. Thomas, 26 Conn. App. 305, 313 (1991). An examination of paragraph 17.d, however, demonstrates two things. The CT Page 4068 deleted sentence does not amount to much when viewed in the total content of the paragraph. And despite expansiveness in language, the paragraph is not supportive of some of the plaintiff's claims for lost rents and the costs of re-letting.
Damages for a breach of contract are to be ascertained as of the time of the breach. West Haven Sound Development Corporation v. West Haven, 207 Conn. 308, 317 (1988). Although the plaintiff's rental claim could conceivably reach the amounts specified on page 4 above, Danpar Associates v. Somersville Mills Sales Room, Inc., supra at 446 counsels that a landlord has an obligation to minimize damages caused by the defaulting tenant's breach of lease. What constitutes a reasonable attempt at mitigation under the specific circumstances of a particular case is a question of fact for the court to decide.
No problem exists with respect to June and July 1992, when the premises were vacant despite timely efforts to rent them. The plaintiff is awarded $1,848.00 per month for these two months. In August and September, 1992, however, the plaintiff received a benefit of $1,500.00 per month from the rent-free occupancy provided to her business enterprise. From the testimony of the plaintiff's realtor, the court determines that rent in the amount of $1,500.00 was the market value of the premises at that time. For August and September, the plaintiff is entitled to the sum of $348.00 per month representing the difference between the monthly rent as per the former lease and the monthly market value of the premises.
Starting with October, 1992 and for all months subsequent thereto, the court concludes that the plaintiff's rental claim was fully mitigated. It was in October that the plaintiff's business began to pay a monthly rent of $1,500.00. Although the rent being paid is $348.00 less per month than the rent in the lease, there are other considerations. Apparently, in October of 1992, the plaintiff's business assumed the status of a going concern. Gerri's Hairport now has several employees. A long term lease would enhance market value. Occupancy by the plaintiff's enterprise eliminates for practical purposes the usual comparison made between rents paid by old and new tenants. See Dalamagas v. Fazzina, 36 Conn. Sup. 523, 525 (App. Sess. 1979). There was, however, nothing in the evidence to indicate that the plaintiff could not have charged her wholly owed business with the same rent she had been paid by either the defendants or by the defacto corporation. CT Page 4069
With respect to the other items claimed as expenses of the re-renting, the court finds none of them to be compensable. To be sure situations exist where contractual damages are measured by the costs of improvements to real estate, e.g. Bachman v. Fortuna,145 Conn. 191, 194 (1958), but this case is not one of them. Particularly relevant here is the language in 3 Restatement (Second) of Contracts 350 and 351 (1979) concerning unforeseeability and avoidability of damages. The court finds that when the defendants signed the lease in January, 1989, they did not foresee and had no reason to foresee that if they moved out the plaintiff would seek to hold them responsible for the expense of opening a new salon complete with the latest in fixtures and equipment and a fully stocked inventory. See Id. 351 comment a (test for foreseeability is an objective one). Typical of the plaintiff's testimony on the issue of avoidability was her response when questioned on the need for new sinks. She replied that the defendants chose to use leaky sinks, but she did not. Paragraph 8 of the lease provides inter alia that the defendants were not responsible for "wear". To accede to the plaintiff's claim for compensation in setting up her new business would flout the general rule of damages, noted in Beckman v. Jalich Homes, Inc., supra, and provide her with a windfall.
Two items that the plaintiff contends fall within the parameters of paragraph 17.d of the lease merit special attention. The ramp for the handicapped that was constructed as a condition of the opening of Geri's Hairport was required by the Town of Brookfield. The other item, an attorney's fee, is specifically mentioned in paragraph 17.d.
Accessibility for the handicapped is a state mandate. See Gen. Stat. 29-269. The question here, however, is simply who should pay for it, a matter of private contract. Deleted from the lease is paragraph 10, which states "Tenant must at Tenant's cost promptly comply with all laws, orders, rules and directions of all governmental authorities . . ." Pursuant to the principles of construction, Hatcho Corporation v. Della Pietra, supra, this deletion demonstrates that the parties intended to make the plaintiff responsible for compliance with governmental demands.
Where a contract provides for payment of an attorney's fee, it is recoverable so long as the amount sought is found to be reasonable. Buccino v. Cable Technology, Inc., 25 Conn. App. 676,679 (1991). The provision for an attorney's fee in paragraph 17.d, however, is different. It provides that the tenant shall be CT Page 4070 liable for "attorney's fees", among other items as part of the landlord's cost of re-renting. Consequently in this case, where the landlord accepted the tenant's surrender, is using the leased premises herself, and is suing for damages, the court considers the provision for attorney's fees to be non-applicable.
 III.
As heretofore noted, the defendants have conceded liability for the plaintiff's vacation wages. In their brief, the defendants have also accepted the method used by the plaintiff in computing weekly net base pay which, pursuant to paragraph 3(d) of the employment agreement governs the amounts that are due. For the period from January 14 until January 22, 1991, the uncompensated one week of vacation in the first year of the employment agreement (September 17, 1990 — September 16, 1991) the agreed upon figure is $916.00.
The parties are in dispute as to proper vacation compensation for the second year (September 16, 1991 — September 15, 1992). In that year, the plaintiff took three vacations: November 26 — December 7, 1991, January 24 — February 1, 1992, and April 6 — April 18, 1992. The dispute concerns the length of the vacations since the first one lasted almost two weeks and the third one was for a full two weeks. The defendants also suggest that the fifteen days of paid vacation time, as set forth in the agreement, should be reduced to ten days because the defacto corporation was dissolved in the eighth month of the corporate year.
The court agrees with the defendants as to the time periods that are compensable. For the vacation in November and December, 1991, the amount of $1,536.00 ($768.00 per week) is ordered and for the vacation from January 24 — January 31, 1992, an additional $971.00 is allowed. The court rejects the suggestion that the dissolution of the defacto corporation should somehow diminish the defendants' liability for vacation pay. Although the description of the defendants in the employment agreement as individuals doing business as a corporation is an anomaly, the agreement, in contradistinction to the lease, was prepared by a lawyer.
The real issue is, of course, whether double damages and an attorney's fees should be awarded as permitted by Gen. Stat.31-72. In pertinent part, 31-72 reads as follows:
When any employer fails to pay an employee CT Page 4071 wages in accordance with the provisions of sections 31-71a to 31-71I, inclusive, or fails to compensate an employee in accordance with section 31-76k, . . . such employee may recover, in a civil action, twice the full amount of such wages with costs and such reasonable attorneys as may be allowed by the court . . . .
Section 31-76k deals with fringe benefits including paid vacations. It was brought into the purview of 31-72 by Public Act 90-55, 1. Before the legislative action, courts had ruled that vacation pay did not constitute wages. McGovern v. Administrator,153 Conn. 692, 693 (1966); Fulco v. Norwich Roman Catholic Diocesan Corporation, 27 Conn. App. 80, 803 (P.A. 90-55, 1 held to be non retroactive) cert. in part granted on an unrelated issue,223 Conn. 917 (1992); Palladino v. Northeast Graphics, Inc.4 CSCR 328 (1989).
To be entitled to twice the full amount of such wages and an attorney's fee, the plaintiff must point to evidence from which the court can find that the defendants acted in bad faith, arbitrarily or unreasonably. Sansone v. Clifford, 219 Conn. 217, 229
(1991). Something more than a breach of the employment contract must be shown. Matteson v. Great Eastern Development, Ltd.,18 Conn. App. 618, 621-22 (1989). The plaintiff incorrectly asserts that in Crowther v. Gerber Garment Technology, Inc., 8 Conn. App. 257, a showing of disloyalty to an employment agreement was sufficiently unreasonable to warrant an award of double damages and an attorney's fee. The court, in Gerber, supra at 265-66 explained that the trial court's additional findings when read together with the finding that the employer had breached the employment contract demonstrated conduct, upon the part of the employer, that was sufficiently reprehensible to support an award of double damages and an attorney's fee.
From the evidence, the court makes the following findings. The defendants never denied owing vacation pay to the plaintiff although a genuine dispute existed as to the amounts that were due. The defendant, Doris Mark, told the plaintiff that she and the defendant, William Possidento, would pay the plaintiff for the unpaid vacations when they could afford it. The defendant, Possidento, was ill with coronary problems from the beginning of April until the end of June, 1992, and, at some time during this period, he underwent surgery. He returned to work on a part-time CT Page 4072 basis in the summer of 1992 and full-time in late August or September. These findings put this case in a posture that is far different from Crowther v. Gerber Garment Technology, Inc., supra. The plaintiff's requests for double damages and an attorney's fee are denied.
In response to another request from the plaintiff, the court awards statutory interest on the overdue vacation debts. Prejudgment interest is a matter for the court's discretion and turns on the question of whether the withholding of money was wrongful under the circumstances. Solomon v. Hall-Brooke Foundation, Inc., supra at 147.
Although the employment agreement states that the vacation money is to be paid in advance, the court selects May 31, 1992 as the starting date for the running of interest. It was on May 31, 1992 that the defendants vacated the plaintiff's building, discharged her as an employee and dissolved the defacto corporation. It was on May 31, 1992 that the withholding of the plaintiff's vacation pay became unquestionably unlawful. See Gen. Stat.31-76k. The total amount of vacation pay owed to the plaintiff is $3,423.00 and statutory interest is $299.57.
 IV.
In summary, the plaintiff is awarded $4,392.00 in her claim for damages arising from the defendant's breach of the lease and $3,722.57 in her claim for vacation pay. Judgment in the amount of $8,114.57 plus taxable costs is entered for the plaintiff.
BARNETT, J.